UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER FRANK, Individually and On Behalf of All Others Similarly Situated, )<br><br>                              Plaintiff, )<br><br>     vs. )<br><br>CENTERLINE HOLDING COMPANY,  MARC D. SCHNITZER, ROBERT L. LEVY, STEPHEN M. ROSS and JEFF T. BLAU, )<br><br>                              Defendants. ) | **CIVIL ACTION NO. 08-cv-01026**<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Peter Frank ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Centerline Holding Company ("Centerline" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of Centerline's securities between March 12, 2007 and December 28, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Centerline (formerly "CharterMac") is the parent company of Centerline Capital

Group, Inc. ("Centerline Capital Group"), a diversified real estate fund manager. Centerline Capital Group lends, invests and manages capital for the commercial real estate and affordable housing industries. Centerline Capital Group is headquartered in New York, New York and has over 500 employees in nine offices throughout the United States.  Throughout the Class Period, Centerline was comprised of the following business segments: (1) Affordable Housing, which was responsible for the management of the Company's revenue bond portfolio (comprised mostly of tax-exempt first mortgage bonds) and which generated to majority of the Company's revenue; (2) Asset Management; (3) Credit Risk Products; and (4) Commercial Real Estate.

3.     On December 28, 2007, the Company shocked investors when it announced that it had sold its $2.8 billion tax-exempt affordable housing bond portfolio to Freddie Mac, thus dramatically changing the Company's business model into a pure asset management firm.  At the same time, the Company stated that it was cutting annual dividends from $1.68 per share to $0.60 per share.  Additionally, the Company announced that The Related Companies, L.P. ("TRCLP"), owned by Defendants Ross and Blau, would provide $131 million in financing to Centerline in exchange for 12.2 million shares of newly-issued convertible preferred stock, which would pay Defendants Ross and Blau a dividend of 11%.

4.     Upon the release of this news, the Company's shares fell $2.57 per share, or over 25 percent, to close on December 28, 2007 at $7.70 per share, on unusually heavy trading volume.

5.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.  Specifically, defendants failed to disclose the following: (1) that defendants were negotiating to sell the Company's tax-exempt revenue bond portfolio to Freddie Mac and that

this portfolio was responsible for the majority of the Company's revenue; (2) that defendants knew that investors would reasonably expect the Company to maintain its tax-exempt mortgage revenue bond portfolio; (3) that without the tax-exempt mortgage revenue bond portfolio, the Company would be unable to pay the substantial dividends that investors had become accustomed to receiving (and which had often formed the basis for investors deciding to purchase and hold Centerline shares); (4) that by selling the tax-exempt mortgage bond portfolio to Freddie Mac, Centerline would become a pure asset management company, as opposed to a tax-exempt bond fund, thus making Centerline securities a far riskier investment than previously; (5) that the Company was attempting to divert a large portion of future income to insiders through a related-party transaction with TRCLP, an entity owned by defendants Ross and Blau; (6) caused the Company to lack adequate internal and financial controls; (7) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

6.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, one of Centerline's principal executive offices is located within this Judicial District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.    Plaintiff, Peter Frank, as set forth in the accompanying certification, incorporated by reference herein, purchased Centerline's securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.    Defendant Centerline (formerly CharterMac) is a Delaware corporation with its principal executive offices located at 625 Madison Avenue, New York, New York.

13.    Defendant Marc D. Schnitzer ("Schnitzer") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and a managing trustee.

14.    Defendant Robert L. Levy ("Levy") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

15.    Defendant Stephen M. Ross ("Ross") was, at all relevant times, the Company's Chairman of the Board of Trustees (the "Board").  Defendant Ross is also Chairman, Chief Executive Officer, founder, and Managing General Partner of TRCLP.

16.    Defendant Jeff T. Blau ("Blau") was, at all relevant times, a managing trustee of the Company.  Defendant Blau is also President and Managing Trustee of TRCLP.

17.    Defendants Schnitzer, Levy, Ross and Blau are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Centerline's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Centerline (formerly "CharterMac") is the parent company of Centerline Capital Group, Inc. ("Centerline Capital Group"), a diversified real estate fund manager. Centerline Capital Group lends, invests and manages capital for the commercial real estate and affordable housing industries. Centerline Capital Group is headquartered in New York, New York and has over 500 employees in nine offices throughout the United States.  Throughout the Class Period, Centerline was comprised of the following business segments: (1) Affordable Housing, which was responsible for the management of the Company's revenue bond portfolio (comprised mostly of tax-exempt first mortgage bonds) and which generated to majority of the Company's

revenue; (2) Asset Management; (3) Credit Risk Products; and (4) Commercial Real Estate.

## Materially False and Misleading
## Statements Issued During the Class Period

19.     The Class Period begins on March 12, 2007.  On this day, the Company issued a

press release entitled "CharterMac Reports Fourth Quarter and Year-End Financial Results."

Therein, the Company, in relevant part, stated:

> CharterMac (the "Company") (NYSE:CHC) today announced
> financial results for the fourth quarter and year ended December
> 31, 2006.
>
> **"*We completed several major initiatives in 2006 that significantly
> changed our Company and transformed CharterMac from a firm
> focused mainly on affordable and multifamily housing to a full-
> service real estate finance and investment company,*" said Marc
> D. Schnitzer, Chief Executive Officer and President of
> CharterMac.** "Our accomplishments included the acquisition of
> ARCap, one of the nation's leading high-yield CMBS fund
> managers, the launch of Centerbrook Financial, our credit risk
> products company, the rollout of a new credit approval process, the
> divestiture of two non-core investments and the completion of a
> corporate re-engineering. *We believe that all of these initiatives
> will help create a more efficient operating structure and provide
> us with a best-in-class platform to grow and compete in a very
> competitive industry. Today we can provide a broad array of debt
> and equity products for any type of real estate property.*"
>
> *         *         *
>
> (In thousands, except per share data)

| Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|

*Revenues:*

| 2006 | 2005 | % change | 2006 | 2005 | % change |
|---|---|---|---|---|---|
| *$127,942* | *$79,828* | *60.3%* | *$387,259* | *$295,097* | *31.2%* |

> *         *         *
>
> **CHARTERMAC   AND   SUBSIDIARIES   SELECTED
> FINANCIAL DATA**

(In thousands, except per share amounts)

| December 31, 2006 | December 31, 2005 |
|---|---|
| *Revenue bonds - at fair value* | |
| *$2,397,738* | *$2,294,787* |

| Three Months Ended | | Twelve Months Ended | |
|---|---|---|---|
| December 31, | | December 31, | |
| 2006 | 2005 | 2006 | 2005 |
| *CAD:* | | | |
| *$28,469* | *$27,287* | *$111,030* | *$114,710* |

\*      \*      \*

CharterMac believes that Cash Available for Distribution ("CAD") is helpful to investors in measuring the performance of our Company. CAD is the performance measure used by our chief decision-makers to allocate resources among our segments. CAD represents net income (computed in accordance with GAAP), adjusted for:

- Cash fees and other revenues received but deferred in accordance with GAAP. Fees recognized for CAD but deferred for GAAP purposes are generally earned over a period of time in connection with certain of our product lines, such as fund sponsorship and credit intermediated fees.

- The effect of straight line revenue recognition of interest income on revenue bonds with fixed changes in interest rates.

- Depreciation and amortization, including write-off of intangible assets.

- Non-cash gains recognized on sale of mortgage loans when servicing rights are retained.

- Losses on sales of loans or repayment of revenue bonds.

- Impairment losses.

- The portion of tax benefit or provision that is not expected to be realized in cash.

- Non-cash compensation expenses.

- The difference between earnings allocated to Subsidiary Equity in accordance with GAAP and distributions to holders of that equity.

There is no generally accepted methodology for computing CAD, and the Company's computation of CAD may not be comparable to CAD reported by other companies. CAD does not represent net cash provided by operating activities determined in accordance with GAAP and should not be considered as an alternative to net income (determined in accordance with GAAP) as an indication of the Company's performance, as an alternative to net cash provided from operating activities (determined in accordance with GAAP) as a measure of our liquidity, or as an indication of our ability to make cash distributions. [Emphasis added.]

20.     Also on or about March 12, 2007, Centerline filed its Annual Report with the SEC on Form 10-K.  The Company's 10-K was signed by Defendants Schnitzer and Levy and reaffirmed the Company's financial results announced on the same day.   Additionally, the Company, in relevant part, stated:

Through our subsidiaries and funds which they manage, we are a full-service real estate finance and investing company.  Our subsidiaries have direct financing relationships with approximately 875 real estate developers and owners throughout the country and we have strong relationships with various institutional investors, pension funds and endowments. We provide an array of products and operate from a fully integrated platform, which enables us to originate, underwrite and manage the risk of most transactions in which we provide debt or equity. Our platform offers us several competitive advantages, including:

- THE ABILITY TO CROSS-SELL FINANCING PRODUCTS.  Frequently on transactions, we offer more than one component of a property's capital;

- THE ABILITY TO ORIGINATE THE TRANSACTION WHOLESALE, which enables us to capture substantially all of the financing fees associated with each transaction;

- THE ABILITY TO CONTROL THE CREDIT QUALITY OF THE UNDERLYING PROPERTY. By working directly with the property's owner and by managing the

risks of the underlying asset, our credit losses have historically been low; and

▪ THE ABILITY TO PROVIDE PRODUCTS AND SERVICES THROUGHOUT THE PROPERTY'S FINANCING LIFE CYCLE.

## Operating Segments

We operate in four business segments:

1. *PORTFOLIO INVESTING, which includes subsidiaries that invest primarily in tax-exempt first mortgage revenue bonds issued by various state or local governments, agencies or authorities and other investments.* The proceeds of mortgage revenue bonds are used by the borrowers to finance the new construction, substantial rehabilitation, acquisition, or refinancing of affordable multifamily housing throughout the United States.

This segment may also include loans to and other investments in other business or funds involved in real estate or real estate finance. Such investments have included our pre-acquisition investment in ARCap Investors, LLC ("ARCap").

\*     \*     \*

## PORTFOLIO INVESTING

We conduct most of our portfolio investing through our CharterMac Equity Issuer Trust I and CharterMac Equity Issuer Trust II subsidiaries. Throughout this document, we will refer to both of these subsidiaries collectively as "Equity Issuer".

*As of December 31, 2006, our revenue bond portfolio includes direct and indirect interests in mortgage revenue bonds with an aggregate fair value of approximately $2.8 billion (prior to $397.3 million of eliminations related to bonds issued by partnerships we consolidate), secured by affordable multifamily properties containing 56,048 units located in 30 states and the District of Columbia.* While most of these mortgage revenue bonds generate tax-exempt income, certain of them generate taxable income. The taxable mortgage revenue bonds are held at the parent trust.

*Our Portfolio Investing business generates most of its income and cash flow from a positive spread between the interest earned from our mortgage revenue bond portfolio and the cost of capital we use to purchase the bonds.* We occasionally receive

9

participating interest on certain mortgage revenue bonds which is equal to a percentage of net property cash flow of the net sale or refinancing proceeds. We also receive fees from borrowers for the acquisition of new mortgage revenue bonds.

The acquisition of mortgage revenue bonds requires capital. In addition to using a portion of our operating cash flows, we obtain such capital by securitizing most of the bonds we purchase and by issuing equity securities.

\*       \*       \*

*The increase in mortgage revenue bond interest income is primarily due to expanding our revenue bond portfolio in 2005 and 2006,* although the rate of investment has slowed due to challenging market conditions we have experienced since 2004.

\*       \*       \*

*Through our subsidiaries, we derive a large portion of our earnings by: investing in mortgage revenue bonds;*

\*       \*       \*

| Operations | 2006 | 2005 |
|---|---|---|
| *Dividends declared per share* | *$1.68* | *$1.65* |

\*       \*       \*

## OUR BOARD OF TRUSTEES CAN CHANGE OUR BUSINESS POLICIES UNILATERALLY

Our board of trustees may amend or revise our business plan and certain other policies without shareholder approval. Therefore, our shareholders have no control over changes in our policies, including our business policies with respect to acquisitions, financing, growth, debt, capitalization and distributions, which are determined by our board of trustees.

\*       \*       \*

Evaluation of Disclosure Controls and Procedures. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of

the end of the period covered by this annual report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this annual report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. [Emphasis added.]

21.    On March 13, 2007, the Company held a conference call with investors and

analysts. Therein, Defendant Schnitzer, in pertinent part, stated:

> **The final initiative that I would like to discuss is our corporate reengineering.** Following our management change in November of 2005, we began a complete reengineering of our organization, the goal of which was to create a more efficient operating platform while maintaining our high level of service. We examined several areas of our Company and found redundancies and inefficient procedures. Following the ARCap acquisition, we took another look at our structure in the context of our growth plans and the desire to broaden our asset classes. As a result of these efforts, we have created a new credit approval process and strengthened our asset management platform. We also recognized that we were a difficult company to understand and explain to our many stakeholders. Beginning in 2001, we made a series of acquisitions and as a result we operate through several subsidiaries, each of which has its own brand name. In connection with our reengineering, we launched a branding initiative that is nearly complete. We believe that it is critical to operate as one Company, with one brand name and all 530 employees aligned with and focused on the success of that single company.
>
> **Therefore, within the next 30 days, we will announce that we will change the name of our Company and eliminate our subsidiary structure and all existing other brand names. When our new brand is rolled out, we will introduce our new structure, which will consist of four business groups: Affordable Housing, Commercial Real Estate, Asset Management and Credit Risk Products. We have identified the leaders of each group and will announce their appointments at the time we announce our new name. The four business groups will be supported by our risk policy, legal, human resources, finance, corporate**

*communications and information technology departments, which together will form our corporate group.* We believe that this structure will enable to us reap even greater benefits from the integration of our past and future acquisitions and describe our business in a clearer fashion. Our first quarter 2007 financial reports will be modified to reflect our new structure and we will introduce new performance metrics for each of our business groups.

*          *          *

*With respect to our Affordable Housing group, which includes our low-income housing tax credit and tax-exempt bond businesses, we expect to have another strong year. We expect stability and modest growth from this business due to the statutory limitations on the availability of both tax credits and tax-exempt bonds.* Since the inception of the tax credit program in 1986, we have been an industry leader with significant market share. Our firm's significant growth and diversification has not reduced our commitment to the affordable housing business. We will continue to represent the highest standard for this industry and seek innovative new products for financing affordable housing.

At the end of 2006, investor demand in the tax-credit equity market was significantly reduced due to historic low rates of return. Since late 2006, yields have increased by more than 100 basis points and investors have shown renewed interest in early 2007. The increased yields have not yet allowed for an increase in margins. However, we believe that margins will be stable in 2007 after declining in 2006. Our growth plans in affordable housing include the development of new complimentary -- complimentary products, incremental tax credit equity market share gains, and in expense reductions. The additional tax credits authorized by Congress after Hurricane Katrina in the Gulf opportunity zone -- which is comprised of Louisiana, Mississippi and Alabama -- have provided us with several opportunities to finance large transactions in that area of the country.

*With respect to tax-exempt bonds, the current supply in the market is low and the demand is at an all-time high. Many national and regional banks have entered the private placement business in order to diversify their product offerings and meet CRA needs. In addition, Fannie Mae and Freddy Mac have become more competitive and now offer longer amortization and more aggressive terms. Overall, we expect flat tax-exempt bond originations for 2007 compared to 2006.* [Emphasis added.]

22.    On April 23, 2007, the Company filed its Definitive Proxy Statement with the SEC on form DEF 14A.  Therein, the Company, in relevant part, stated:

> The Company's nominating and governance reviews, monitors and approves any transactions by the Company in which a trustee, an officer or our Manager or any of its affiliates has a direct or indirect personal interest, oversees compliance with the Future Relations Agreement between Centerline and **TRCLP, the Company's only shareholder owning more than 5% of our outstanding voting shares**, and reviews disputes that may arise from any of the agreements related to the Company's acquisition of Centerline Advisors.
>
> *        *        *
>
> **Related Management Company, which is wholly owned by TRCLP, earned fees for performing property management services for various properties held in investment funds we manage and consolidate. The fees totaled $4.3 million in 2006.**
>
> **TRCLP, which is majority controlled by Mr. Ross, provides services to us under a shared services agreement. The services provided include office management, payroll, human resources and other office services. The majority of the services are charged to us at the direct cost incurred by TRCLP. During 2006, we paid TRCLP $620,000 for such services.**
>
> *        *        *
>
> **Related General II, L.P. owns 685 Common Shares and 10,194,400 Special Common Units of Centerline Capital Company, LLC (formerly known as CharterMac Capital Company LLC), which are convertible into Common Shares of the Company on a one-for-one basis, subject to certain restrictions, and the associated 10,194,400 Special Preferred Voting Shares. Related General II, L.P. is owned by TRCLP. Mr. Ross owns 92% of TRCLP and Mr. Blau owns the remaining 8%.** [Emphasis added.]

23.    On May 10, 2007, the Company issued a press release entitled "Centerline Holding Company Reports First Quarter 2007 Financial Results."  Therein, the Company, in relevant part, stated:

"Due to the seasonality of our business, our origination volume across our business lines tends to be the slowest in the first quarter and as a result, our earnings and Cash Available for Distribution are not earned evenly throughout the year," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "In addition, our first quarter financial results were impacted by an impairment we recorded in connection with revenue bonds secured by mortgages on six properties and a charge to reserve against associated receivables. Therefore, *while our dividend payout ratio is above 100% in this quarter, we are comfortable that our annual dividend will continue to have adequate coverage.* We have solid investment pipelines in both our Commercial Real Estate Group and Affordable Housing Group and we continue to see a tremendous amount of transaction volume. In addition, *we are working on several new growth initiatives we expect to launch in 2007. Based on the progress we have made executing our business plan to date, we remain confident that we will meet our investment and financial goals for the year and do not believe it is necessary to revise our guidance at this time."*

\*      \*      \*

**CENTERLINE HOLDING COMPANY AND SUBSIDIARIES**

**SELECTED FINANCIAL DATA**

(In thousands, except per share amounts)

=============================

*Revenue bonds - at fair value:*

| March 31, 2007 | December 31, 2006 |
|---|---|
| *$2,460,894* | *$2,397,738* |

[Emphasis added.]

24.     Also on May 10, 2007, Centerline filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by the Individual Defendants Schnitzer and Levy and reaffirmed the Company's financial results announced on the same day.   The Company stressed the fact that the fair value of its mortgage revenue bonds was $2.46 billion as compared to $2.39 billion at the end of 2006.  Moreover, revenue from interest income amounted to 63% of the Company's total revenue, compared to 57.6% in first quarter of 2006.  Additionally, the

Company, in relevant part, stated:

> EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES.  Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

25.    Additionally, on May 10, 2007, the Company held a conference call with investors and analysts.  Therein, Defendant Schnitzer, in pertinent part, stated:

> As we stated in this morning's press release, due to the seasonality of our business our origination volume across business lines tends to be the slowest in the first quarter. As a result, our earnings and cash available for distribution are not earned evenly throughout the year. In addition, our first quarter financial results were impacted by an impairment we recorded in connection with six revenue bonds we hold on our balance sheet and a charge to reserve against associated receivables. ***Although our dividend payout ratio is above 100% in this quarter we are comfortable that our annual dividend will continue to have adequate coverage***. We have solid investment pipelines in both our Commercial Real Estate Group and our Affordable Housing Group, and we continue to see a tremendous amount of transaction volume. [Emphasis added.]

26.    On July 18, 2007, the Company filed a current report with the SEC on form 8-K. Therein, the Company, in relevant part, stated:

> ***On July 12, 2007, the Compensation Committee and the Nominating and Governance Committee (the "Committees") of Centerline Holding Company (the "Registrant") approved the cancellation of an option to purchase common shares of beneficial interest ("Common Shares") of the Registrant issued***

*to Stephen M. Ross, the Chairman of the Board of Trustees of the Registrant, on November 17, 2003 (the "Cancelled Option") and the substitution of the Cancelled Option with an option to purchase Common Shares (the "Substitute Option") on substantially similar terms as the Cancelled Option.*

The Committees took this action because Mr. Ross otherwise likely would have been subject to adverse tax consequences under Section 409A ("Section 409A") of the Internal Revenue Code of 1986, as amended, that were unforeseen at the time the Registrant granted the Cancelled Option. *The Cancelled Option was issued to Mr. Ross in consideration of his service as the Chairman of the Board of Trustees of the Registrant in connection with the Registrant's acquisition of Related Capital Company (now known as Centerline Affordable Advisors LLC) (the "RCC Transaction"). The Cancelled Option had an exercise price ($17.78 per share) that was below the market value of the Company's Common Shares on November 17, 2003*, the effective date of the Cancelled Option, because the parties previously had agreed that the exercise price would equal the average of the closing price of the Company's Common Shares for the 30 calendar days immediately preceding the public announcement of the Company's acquisition of Related Capital Company. For purposes of Section 409A, the holder of a share option like the Cancelled Option that has been granted with an exercise price less than the fair market value of the underlying common shares on the date of the grant, to the extent not vested as of January 1, 2005, is subject to adverse tax consequences.

*The Substitute Option, which was granted with an exercise price above the market price of the Registrant's Common Shares on its grant date, contains the identical exercise price ($17.78 per Common Share) as the Cancelled Option; expires on the same date (November 17, 2013) as the Cancelled Option; grants an option to purchase the same number of Common Shares (800,000) that remained unexercised under the Cancelled Option;* and provides for the same vesting schedules with respect to the remaining unvested shares under the Cancelled Option (400,000 of which are vested immediately, 200,000 of which are due to vest on November 17, 2007 and 200,000 of which are due to vest on November 17, 2008) . Because the terms of the Cancelled Option and the Substitute Option are substantially similar, the Registrant anticipates that the cancellation and re-grant will have no effect on share-based compensation expenses reported in the Registrant's financial statements. [Emphasis added.]

27.    On August 9, 2007, the Company issued a press release entitled "Centerline

Holding Company Reports Second Quarter 2007 Financial Results."  Therein, the Company, in

relevant part, stated:

> ### Centerline Affirms No Single-family Subprime Exposure
>
> NEW YORK--(BUSINESS WIRE)--Aug. 9, 2007--Centerline Holding Company (NYSE: CHC) ("Centerline" or the "Company"), the parent company of Centerline Capital Group, today announced financial results for the second quarter and six months ended June 30, 2007.
>
>        \*      \*      \*
>
> *Stable credit performance within $2.8 billion revenue bond portfolio; At June 30, 2007, thirteen bonds with an outstanding balance of $70.1 million were delinquent, representing 2.5% of the entire portfolio;*
>
>        \*      \*      \*
>
> *"In the past few weeks, the financial markets have been impacted by a re-pricing of risk and withdrawal of liquidity due to the serious credit problems in the single-family subprime mortgage industry," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "Centerline does not have any single-family or subprime exposure whatsoever. We are a commercial real estate finance and investment company and provide financing only for commercial and multifamily properties. As evidenced by our CAD growth this quarter, our core businesses continue to perform well and the credit quality of the investments we manage remains strong."*
>
> Mr. Schnitzer continued: "The recent market dislocation has created numerous opportunities to make investments that offer attractive risk-adjusted returns and strong credit quality. In times of market instability, we would expect to see a flight to quality that benefits firms like Centerline, that have a proven ability to assess and manage real estate risk. *We will monitor market conditions carefully as we continue to execute our core strategy*."  [Emphasis added.]

    28.    Also on August 9, 2007, Centerline filed its Quarterly Report with the SEC on

Form 10-Q.  The Company's 10-Q was signed by the Individual Defendants Schnitzer and Levy

and reaffirmed the Company's financial results announced on August 9, 2007.  Additionally, the

Company, in relevant part, stated:

> EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES
>
> Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

29.    Also on August 9, 2007, the Company held a conference call with investors and analysts. During this call, Defendants Schnitzer and Levy, in pertinent part, stated:

> [Schnitzer]: In the past few weeks, the financial markets have been impacted by a repricing of risk and withdrawal of liquidity, due to the serious credit problems in the single-family subprime mortgage industry. ***I would like to assure you that Centerline does not have any single-family or subprime exposure whatsoever. We are a commercial real estate finance and investment company, and we provide financing only for commercial and multifamily properties. As evidenced by our CAD growth this quarter, our core businesses continue to perform well, and the credit quality of the investments we manage remains strong.***
>
> ***In spite of the instability in the financial markets, operating fundamentals in the commercial real estate and affordable housing sectors are healthy. We have sufficient capital resources to execute our business plan, and we are not experiencing any liquidity problems.*** In fact, during the past 30 days, we have priced a collateralized debt obligation offering from one of our CMBS funds and closed on the expansion of our revolving credit facility. Both transactions demonstrate our ability to execute in a volatile market environment.

The recent market dislocation has created numerous opportunities to make investments that offer attractive returns and strong credit quality. ***In times of market instability, we would expect to see a flight to quality that benefits firms like** Centerline, **that have a proven ability to assess and manage real estate risk.***

Our business is sound. Despite that, we have seen our stock price decline in recent weeks as concerns about mortgage or real estate-related businesses spread to the stock market. Many of our investors inquired as to why we did not make any public statements during this period. We felt that it was important to wait until we released our earnings, so we could support the confidence we have in our business with solid facts.

***As we reported in this morning's press release, we had a very strong quarter, with CAD per share of $0.46, which is a 12.2% increase over CAD per share in the second quarter of 2006.*** As of June 30th, our direct assets under management were $17.1 billion, an increase of 7% over the first quarter.

***The market instability has had little or no impact on our Affordable Housing Group, which includes our tax-exempt bond and tax credit equity fund businesses. Affordable Housing represents approximately 65% of our annual CAD revenues.***

\*            \*            \*

In regard to our direct tax-exempt bond business, we continued to experience strong competition for originations, mostly from large banks that acquire bonds to satisfy their Community Reinvestment Act requirements. As a result, we have lowered our budget for new bond originations in 2007 to $300 million, from the $400 million we had originally projected.

***The credit quality of our bond portfolio remains very strong.*** As of June 30th, delinquencies totaled just $70.1 million, or approximately 2.5% of our $2.8 billion portfolio. After the impairments we recorded in the first quarter, we performed a thorough re-underwriting of 122 bonds in our portfolio that were not performing as well as we expected out of our total of 376 bonds. In the second quarter, we recorded only an additional $3 million in permanent impairments with respect to these bonds.

Since our inception as a public company in 1997, our bond portfolio has incurred less than $30 million, or approximately 1%, in cumulative permanent impairments.

\*            \*            \*

[Levy]: In summary, we have almost no mark-to-market risk, and we are fully compliant with all covenants on all of our facilities. In the past few months, we have closed on $270 million in new debt facilities, as we expanded our corporate revolver in our agency facility, proving our access to capital in a very difficult environment. And our most significant funding source, our bond securitizations, are financed in what has proven to be a safe-haven market.

Finally, we are being very careful to maintain our liquidity in the face of the recent market turbulence. As of June 30th, 2007, Centerline had $169 million in liquidity, including $111 million in cash and $58 million in availability in our corporate revolver. I hope this description gives you some comfort as to the health of our balance sheet and our funding sources.

Now onto our earnings -- for the three months ended June 30th, 2007, Centerline reported cash available for distribution, or CAD, of $26.9 million, or $0.46 per diluted share; compared to $23.9 million, or $0.41 per diluted share, in the corresponding three-month period of 2006.

*       *       *

Total revenues for the three months ended June 30th, 2007 were $94.6 million, versus $86.2 million in the corresponding period last year. ***This year-over-year 9.8% increase is primarily due to the impact of the ARCap acquisition and the increased size of our tax-exempt bond portfolio.***

***Over the past four quarters, our bond portfolio has grown by $230 million, while the average yield on the portfolio has held steady, at 6.6%.*** Year-to-date, we have had almost no repayments of bonds and do not expect a significant number this year. Our bond portfolio remains very healthy from a credit perspective, as we have recognized only $2.9 million in additional impairments in the second quarter, equating to 0.1% of the total principle outstanding. [Emphasis added.]

30.    On November 8, 2007, the Company issued a press release entitled "Centerline Holding Company Reports Third Quarter 2007 Financial Results." Therein, the Company, in relevant part, stated:

**Third Quarter Highlights:**

- Direct Assets Under Management ("AUM") grew to $18.2 billion, an increase of 6.5% over the second quarter of 2007 and 22.8% over the third quarter of 2006;

- Revenues, adjusted to exclude Consolidated Partnerships(a), of $104.8 million, an increase of 2.4% over the third quarter of 2006;

                    *       *       *

- Stable credit performance within $2.9 billion revenue bond portfolio; At September 30, 2007, 15 bonds with an outstanding balance of $88.9 million were delinquent, representing 3.1% of the entire portfolio;

                    *       *       *

*"Despite the ongoing credit crisis, Centerline had another solid quarter of operations," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "In very difficult market conditions, we closed a $585 million high-yield CMBS fund and priced and closed a $986 million CDO for one of our CMBS investment funds. We believe these accomplishments are evidence of the strength of the Centerline brand and are a strong endorsement of our ability to assess and manage real estate risk."*

                    *       *       *

**CENTERLINE HOLDING COMPANY AND SUBSIDIARIES**

**SELECTED FINANCIAL DATA**

[in thousands)]

*Mortgage revenue bonds - at fair value:*

| September 20, 2007 (unaudited) | December 31, 2006 |
|---|---|
| *$ 2,578,107* | *$2,397,73* |

[Emphasis added.]

31.     Also on November 8, 2007, the Company held a conference call with analysts and investors.  During this call, the Defendant Schnitzer stated:

[ANALYST]: I just wanted to ask you guys, particularly in the current market environment you've been putting us out some really solid performance. *However, it's obvious in your stock price that you're not being rewarded for that in the marketplace.* You addressed before a little bit about your -- you're thinking about stock buybacks. But more generally, *can you walk us through your thinking about how you can help close that value gap or initiatives you might take to close that gap between where your stock price is and the true value of the Company?*

MARC SCHNITZER: *Well yes, we believe and we have believed for some time that the way to really increase the value of the Company is to continue to evolve the Company into a fund manager.* And, many of you will recall that back in 1997, when we were called CharterMac and the company first went public, it had one line of business and that was really to be a tax-exempt bond fund that lent money long and borrowed short.

*Ever since that time, our growth has really focused on evolving into externally managed funds* whether it's our tax credit funds, our CMBS funds, our high yield debt funds, our joint venture equity funds, the CLO business. All of these significant growth initiatives and others that we're thinking about, such as this debt opportunity fund are steering us toward an evolution into much more of a pure fund manager which is where we really see the growth for the Company and *we believe that the marketplace rewards companies like that with a higher valuation* on their income stream to a much greater extent than our Company realizes today.

*So, we've been going through this evolution. We will continue to go through this evolution and our goal will be to make the Company into much more of a pure fund manager* and then go out and tell the world about it in the most effective way that we can. And our thesis would be that our multiple should go up and that's what our advisors have suggested. So, that's more of a global approach. I don't know if that is as specific an answer as you wanted.

[ANALYST]: Well, I understand. I think we've had some of these discussions before about turning into a fund manager. There are two further issues. One is, you are obviously executing along that track. But the market still doesn't seem to either recognize it or be rewarding it. And, sort of related to that, *have you ever considered putting -- taking the bonds off your balance sheet or letting them roll off into some other sort of vehicle?*

MARC SCHNITZER: ***Well, clearly a strategy like that plays into the overall evolution of the Company. So, clearly it's something that we've thought of from time to time.*** We're not yet in a position where we can make the case in a very compelling way that we are a pure fund manager when we have $2.9 billion of bonds on our balance sheet which is reminiscent of the bond fund that we were. So, I think that complicates the story and our goals are really to try to simplify the story as much as we can.

[ANALYST]: And is there anything -- ***so you generally thought about the bond issue but I guess you're not commenting right now on the specifics of it?***

***MARC SCHNITZER: We've thought about that and many other options. But, clearly that's one that would come to mind right away.*** [Emphasis added.]

32.    On November 9, 2007, Centerline filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendants Schnitzer and Levy and reaffirmed the Company's financial results previously announced on November 8, 2007.  Additionally, the Company, in relevant part, stated:

Affordable Housing brings together the users and providers of debt and equity capital to the affordable multifamily rental housing industry, and includes:

- Mortgage Revenue Bond Investing - through the parent and our subsidiaries, we invest primarily in tax-exempt first mortgage revenue bonds issued by various state or local governments, agencies or authorities.  The proceeds of these mortgage revenue bonds are used to finance the new construction, substantial rehabilitation, acquisition, or refinancing of affordable multifamily housing properties located throughout the United States;

\*                    \*                    \*

**Mortgage Revenue Bond Investing**

The increase in mortgage revenue bond interest income is primarily due to the higher portfolio balance due to acquisition activity in the past year offset by a lower weighted average yield when analyzed against the comparable period.

While generally declining yields of bonds acquired has gradually lowered the average yield of our portfolio, we continue to earn a positive spread on our portfolio. With an increase in the average portfolio balance, our level of securitizations also increased which resulted in higher interest expense and securitization fees. By entering into a fixed rate securitization in 2006 and using interest rate swaps to fix the rate on a large portion of our remaining securitizations, we believe that we have significantly mitigated the impact on spreads of fluctuating SIFMA rates.

*                    *                    *

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. us and our joint venture partners may negatively impact the benefits to be achieved by the joint venture.

33.    The statements contained in ¶¶ 19-32 were materially false and misleading when made because defendants: (1) that defendants were negotiating to sell the Company's tax-exempt revenue bond portfolio to Freddie Mac and that this portfolio was responsible for the majority of the Company's revenue; (2) that defendants knew that investors would reasonably expect the Company to maintain its tax-exempt mortgage revenue bond portfolio; (3) that without the tax-exempt mortgage revenue bond portfolio, the Company would be unable to pay the substantial dividends that investors had become accustomed to receiving (and which had often formed the

basis for investors deciding to purchase and hold Centerline shares); (4) that by selling the tax-exempt mortgage bond portfolio to Freddie Mac, Centerline would become a pure asset management company, as opposed to a tax-exempt bond fund, thus making Centerline securities a far riskier investment than previously; (5) that the Company was attempting to divert a large portion of future income to insiders through a related-party transaction with TRCLP, an entity owned by defendants Ross and Blau; (6) caused the Company to lack adequate internal and financial controls; (7) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

## The Truth Begins to Emerge

34.    On December 28, 2007, the Company shocked investors when it issued a press release entitled, "Centerline Holding Company Completes Securitization of $2.8 Billion Tax-Exempt Affordable Housing Bond Portfolio with Freddie Mac."  Therein, the Company, in relevant part, stated:

> Centerline Holding Company (NYSE:CHC), the parent company of Centerline Capital Group, Inc. ("Centerline" or the "Company"), **today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management company. Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.**
>
> "Over the past several years, the strategic vision embraced by Centerline's Board of Trustees and management has been to transform Centerline into an alternative asset management company," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline.  **"With the securitization of our bond portfolio with Freddie Mac, we have accelerated our progress toward that goal.** The transaction has materially improved our risk profile by reducing the funding and interest rate risk inherent in

our liability structure. Centerline now has a leaner balance sheet, improved credit metrics and an increased percentage of revenues derived from asset management services. *As an alternative asset manager with $11.6 billion of assets under management, we aim to produce returns and growth comparable to other publicly-traded alternative asset managers."*

"Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

Stephen M. Ross, Chairman of Related Companies and Centerline, added, *"Centerline has undergone an amazing evolution from the affordable housing firm I started 35 years ago to an industry leader in real estate investment and finance.* Centerline has a premier, seasoned management team and a compelling growth story as an alternative asset manager. This equity investment in Centerline will help the Company implement its new initiatives and build the foundation for future expansion. I strongly endorse Centerline's growth strategy and the ability of the management team to execute it."

**Freddie Mac Transaction**

*Centerline completed a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac.* The bond portfolio is secured by mortgages on approximately 59,000 units of affordable multifamily properties in 31 states. *For accounting purposes, most of the securitization will be treated as a sale.* Centerline retained a high-yielding first-loss position (the "B-Piece") in the portfolio and will remain the primary and special servicer.

"We are thrilled to partner with Freddie Mac on this innovative transaction," said Mr. Schnitzer. "Retaining the B-Piece and our ongoing servicing arrangement creates a fund management structure for the bond portfolio similar to our other funds. Through our partnership with Freddie Mac, as their first Targeted Affordable Housing Lender, we will improve the competitiveness of our affordable housing business and assist in the expansion of assets under management."

Centerline used the proceeds from the Freddie Mac bond securitization to redeem its existing financing arrangements, retire corporate debt and pay the costs and expenses associated with the transaction.

In connection with the transaction, Centerline expects to record net, one-time charges of $45 million to $55 million in the fourth quarter of 2007. Net of minority interest allocations, the Company expects these charges to reduce net income by $30 million to $40 million. Gains incorporated in the net charge include a gain on the sale of the bonds, previously deferred revenues and recovery of impairment charges. Losses incorporated in the net charge include writing off deferred costs associated with the bonds and securitization trusts, recognizing fair value losses on certain interest rate swaps, costs to terminate existing financing arrangements and transaction related costs. These transaction-related costs of approximately $95 million will impact the Company's 2007 Cash Available for Distribution ("CAD"). Centerline has reduced the Company's previous CAD per share guidance for 2007 from $1.89 to a range of $1.70 to $1.75, exclusive of the transaction related costs associated with the securitization.

**$131 Million Investment from An Affiliate of Related Companies**

An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. ***The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company.*** The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

*         *         *

Change Dividend Policy: ***Effective in the first quarter of 2008, Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis), subject to approval by our Board of Trustees.*** The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008. [Emphasis added.]

27

35.    On December 28, 2007, immediately subsequent to the shocking news, the Company held a conference call with investors and analysts.  During this call, the following exchanges, in relevant part, took place:

> MARC SCHNITZER: Good morning. We appreciate everyone calling in on short notice. ***This morning, we announced the closing of a transformational transaction that has been in the works for close to a year and a significant strategic investment in our firm by our larger shareholder.***
>
> *        *        *
>
> The Freddie Mac transaction is a fixed-rate securitization of our bond portfolio, slightly over $2.8 billion. That securitization has an all-in cost of approximately 5.39%. The portfolio's current coupon is somewhere between 6.5% and 6.6%. The transaction will give us sale treatment for accounting purposes with respect to the majority of the portfolio and ***Centerline will retain a $140 million high-yielding B-Piece, top loss piece***, and we will remain the primary and special servicer for the portfolio.
>
> *        *        *
>
> [ANALYST]: When you say first loss, does that mean you take the hit before Freddie Mac takes the hit on the entire portfolio, or just the 140 million part?
>
> MARC SCHNITZER: The $140 million, Tony, is a top loss for the entire portfolio. ***So the first $140 million of losses in the portfolio comes out of that $140 million.***
>
> *        *        *
>
> [ANALYST]: Final question, Marc. Was it considered as far this transformation as far as why not take the Company the private, since basically our shareholders and ***a lot of shareholders have owned your stock over the years for the dividend and for the tax-free status. So in some way, you're basically not only transforming the Company, but you are changing the shareholder base. So you are basically punishing the income (inaudible) the shareholders*** for a more growth-oriented shareholders that may want to buy your stock in the future.
>
> *        *        *

[INVESTOR]: This capital raise makes no sense to me. *If Related wants to participate in and fund the growth of the Company, they should be taking the same equity risk as the rest of common shareholders. They're getting an 11% coupon and a call option on 20% of the Company with no equity risk. It speaks of an affiliated entity getting a sweetheart deal.* You said there were other parties to talk to. If you want to raise capital and you want to fund growth, you owe it to your investors to get on the road and do a marketed deal. How is this an acceptable way to raise capital?

\*       \*       \*

[INVESTOR]: I have to agree with the prior two callers. *I'm actually disgusted by this transaction. How could insiders to reach such a favorable deal for themselves?* If you really feel like they are being -- attempting to support all shareholders, then we should open this up to a rights issue and they backstop it with a preferred, right? So open up the -- for capital raise as a rights issue, and then whatever is not taken up, then they can put in the preferreds. *But this is too favorable of a deal. And I will also agree that you're completely alienating your shareholders here. Your shareholders are looking for dividend yields,* and now you're saying, will if that didn't, we're going to change it. *You're running this like it's a private company.* I would be disgusted if I were you at what you've done -- I'm just disgusted. I would be ashamed at what I did.

MARC SCHNITZER: There are really two issues there again. As we said before, the critical issues on the preferred were testing it in the marketplace, which it was; the timing of the investment and the market conditions. And based on the terms that were available from third parties in the marketplace, the need for the timing of the capital and an extremely unstable market, we feel that this is an attractive transaction.

[INVESTOR]: *Well, your shareholders are clearly not agreeing with you.* Your equities hit a brand-new load today on meaningful volume on even a slow day. So you're wrong. So I really kind of question your thinking on this, and *I am just disgusted by it.* What shareholder consent is going to be required to get this through?

\*       \*       \*

[INVESTOR]: I would just like to -- *I would echo the disgust and frustration of previous shareholders who have spoken on this call. I think this is a -- I think this transaction is contemptuous of your existing shareholders.* But in any event, I would like to ask

about the timing of this announcement where it's a Friday morning, two days before the end of the year. Why announce this transaction today? Why not wait until the first part of next year, and why not wait at least until a day when people are in the office by and large, particularly your shareholders, who are probably on vacation, most of them? ***It just seems strange that you would choose today to announce this transaction.*** Could you address that?

\*    \*    \*

[INVESTOR]: Just a closing remark related to the investor by Related. It says that the transaction is expected to close in January 2008. If it hasn't closed, I would suggest not closing it, especially not on the terms that you have put forth. ***When investors are using words like disgusted, egregious and disingenuous on a call, I think it's evident that this is a bad transaction.*** The right thing to do might be to do, if you really need capital now, which is arguable, you could do a rights offering and let Related backstop it. And finally, if you are this out of step with institutional shareholders, maybe the right thing to do is just put this company up for sale. [Emphasis added.]

36.    On this news, and following these events, the Company's shares fell $2.57 per share, or over 25 percent, to close on December 28, 2007 at $7.70 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Centerline's securities between March 12, 2007 and December 28, 2007, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

38.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Centerline's securities were actively traded on the

New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Centerline or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;
>
> (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Centerline; and
>
> (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

43.     The market for Centerline's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, Centerline's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Centerline's securities relying upon the integrity of the market price of Centerline's securities and market information relating to Centerline, and have been damaged thereby.

44.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Centerline's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

45.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Centerline's financial well-being, business relationships, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an

unrealistically positive assessment of Centerline and its financial well-being, business relationships, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

46. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47. During the Class Period, Plaintiff and the Class purchased Centerline's securities at artificially inflated prices and were damaged thereby. The price of Centerline's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

48. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Centerline, their control over, and/or receipt and/or modification of Centerline's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary information concerning Centerline, participated in the fraudulent scheme alleged herein.

49.    Moreover, defendants' scienter is evident by the fact that, in addition to other things: (1) they withheld, for close to a year, information regarding the sale of the Company's tax-exempt bond portfolio to Freddie Mac; (2) by cutting the annual dividend from $1.68 to $0.60 per share, they changed the profile of potential investors in the Company; (3) they were able to divert $131 million to Company insiders from shareholders by going forward with the TRCLP transaction (Defendants Ross and Blau would receive approximately 12.2 million new convertible preferred shares at $10.75 per share); (4) the Individual Defendants knew or should have known of the portfolio sale to Freddie Mac, and knew or should have known of the effect this would have on annual dividends; (5) Defendant Schnitzer, due to his position, knew or should have known of the portfolio sale to Freddie Mac at all relevant times during the Class Period.

50.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 148,578 shares of the Company's stock for gross proceeds of $1,567,470.  This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| December 21, 2007 | CARTER, DARYL J. | 36,000 | $11.22 | $403,920 |
| December 20, 2007 | CARTER, DARYL J. | 83,000 | $10.04 | $833,319 |
| December 19, 2007 | CARTER, DARYL J. | 20,103 | $10.01 | $201,231 |
| August 20, 2007 | CROUCH, CHRISTOPHER G. | 9,475 | $13.61 | $129,000 |
|  | **TOTAL:** | **148,578** |  | **$1,567,470** |

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

51.    At all relevant times, the market for Centerline's securities was an efficient market for the following reasons, among others:

(a)    Centerline's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Centerline filed periodic public reports with the SEC and the NYSE;

(c)    Centerline regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Centerline was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

52.    As a result of the foregoing, the market for Centerline's securities promptly digested current information regarding Centerline from all publicly-available sources and reflected such information in the price of Centerline's securities.  Under these circumstances, all purchasers of Centerline's securities during the Class Period suffered similar injury through their purchase of Centerline's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

53.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Centerline who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Centerline's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

56.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Centerline's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Centerline's financial well-being, business relationships, and prospects, as specified herein.

58.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Centerline's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Centerline and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Centerline's securities during the Class Period.

59.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's

management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

60.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Centerline's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Centerline's securities was artificially inflated during the Class Period. In ignorance of the fact that market

prices of Centerline's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Centerline's securities during the Class Period at artificially high prices and were damaged thereby.

62.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Centerline was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Centerline securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

63.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
#### Violation of Section 20(a) of
#### The Exchange Act Against the Individual Defendants

65.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.    The Individual Defendants acted as controlling persons of Centerline within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

68.    As set forth above, Centerline and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the

Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 31, 2008                         Respectfully submitted,

                                                BRODSKY & SMITH, LLC

                                                By: *Evan J. Smith, Esquire*
                                                Evan J. Smith, Esquire
                                                240 Mineola Boulevard
                                                Mineola, NY 11501
                                                516-741-4977
                                                516-741-0626 (facsimile)

                                                **SCHIFFRIN BARROWAY
                                                TOPAZ & KESSLER, LLP**
                                                Richard A. Maniskas
                                                D. Seamus Kaskela
                                                David M. Promisloff
                                                280 King of Prussia Road
                                                Radnor, PA 19087
                                                (610) 667-7706
                                                (610) 667-7056 (fax)
                                                **Attorneys for Plaintiff**